IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUNPOWDER RIVERKEEPER,<br>P.O. Box 156<br>Monkton, MD 21111,<br><br>      Plaintiff,<br><br>v.<br><br>ANDREW WHEELER, in his official capacity<br>as Administrator of the United States<br>Environmental Protection Agency,<br><br>and<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY,<br>1200 Pennsylvania Ave., N.W.<br>Washington, DC 20460,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>CIV. NO. 20-cv-2063 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. This complaint challenges a final action of the United States Environmental Protection Agency and its Administrator (collectively, "EPA" or "Defendants") pursuant to the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1388 (the "Clean Water Act" or "CWA") and the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 (the "APA").

2. Plaintiff Gunpowder Riverkeeper challenges EPA's October 3, 2016 approval of the Total Maximum Daily Load of Polychlorinated Biphenyls in the Gunpowder River and Bird River Subsegments of the Gunpowder River Oligohaline Segment, Baltimore County and Harford County, Maryland (the "Gunpowder and Bird rivers TMDL" or "TMDL"), submitted by

the Maryland Department of the Environment ("MDE"). Exs. A; B. Maryland's tidal Gunpowder and Bird rivers suffer from polychlorinated biphenyl ("PCB") pollution that violates applicable water quality standards. The TMDL, required to remediate pollution in the rivers, violates the CWA by failing to allocate pollution loads to all sources of PCBs.

3. Specifically, the Gunpowder and Bird rivers TMDL did not allocate a pollution load for <u>the</u> major source of PCBs in the rivers: resuspension and diffusion of PCB-laden bottom sediment. Ex. A, at 19.

4. Under Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2), Defendants had a duty to disapprove the TMDL for its violation of the CWA.

5. Defendants failed to perform this duty and instead approved the TMDL.

6. Plaintiff commences this action under the citizen suit provision of the CWA, 33 U.S.C. § 505(a)(2), seeking declaratory relief declaring that Defendants failed to perform a nondiscretionary duty in violation of the CWA and injunctive relief to compel Defendants to disapprove the illegal TMDL.

7. Plaintiff also claims that Defendants' approval of the TMDL is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a).

**PARTIES**

8. Plaintiff Gunpowder Riverkeeper ("GRK") is a 501(c)(3) nonprofit organization incorporated in Maryland.

9. GRK is a grassroots, advocacy-based membership organization dedicated to protecting, conserving, and restoring the Gunpowder River and its watershed, as well as strengthening ties within the communities that benefit from the river.

10. GRK has approximately 370 members who live, work, and recreate along the Gunpowder and Bird rivers. GRK's members benefit from water quality protections for the designated uses of these waterways, including fishing and shellfish harvesting.

11. Theaux M. Le Gardeur, Executive Director and member of GRK, owns and operates a fly-fishing shop and fishing guide service that caters to fishers on the Gunpowder River and its tributaries. Mr. Le Gardeur also fishes, wades, canoes, and boats in the Gunpowder and Bird rivers and hikes, photographs, and enjoys scenery along the rivers' banks.

12. GRK's members, including Mr. Le Gardeur, suffer environmental, aesthetic, recreational, and professional injuries as a result of EPA's unlawful approval of the TMDL, which fails to include pollution loads for all sources of PCBs, thus prolonging the rivers' violation of their designated uses.

13. As a result of EPA's approval of ongoing PCB pollution, GRK's members, including Mr. Le Gardeur, refrain from certain activities along these waterways, like consumption of fish, or risk exposure to carcinogenic PCBs if they undertake those activities. The continued pollution of the Gunpowder and Bird rivers also adversely affects members' enjoyment of recreational activities and the ability to generate income from the waterways. GRK members, including Mr. Le Gardeur, would engage in these activities were the PCB pollution abated.

14. If the unlawful TMDL is replaced by a TMDL compliant with the CWA and APA, then the harm to Plaintiff's members would be redressed.

15. Defendant EPA is the federal agency responsible for the implementation of Section 303 of the CWA, 33 U.S.C. § 1313.

16.     Defendant Andrew Wheeler is the Administrator of EPA. He is charged with the supervision and management of all decisions and actions of the agency, including those pursuant to the CWA. Administrator Wheeler is being sued in his official capacity.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a)(2), and 28 U.S.C. § 1331.

18.     On February 27, 2020, Plaintiff mailed Defendants notice of intent to bring this action, as required by the CWA and implementing regulations. 33 U.S.C. § 1365(b)(2); 40 C.F.R. § 135.2 and 135.3. See Exs. C; D.

19.     Pursuant to 40 C.F.R. § 135.2, a copy of the notice was provided to all other required parties, including the U.S. Attorney General. Ex. D

20.     Sixty days have passed since Plaintiff's service of notice, as required under 33 U.S.C. § 1365(b)(2). See Exs. C; D.

21.     Venue in this District is proper, pursuant to 28 U.S.C. § 1391(e)(1), because Defendants reside in this District.

## STATUTORY AND REGULATORY FRAMEWORK

22.     In 1972, Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The goals of the CWA are to eliminate pollution of the nation's waterways and to attain water quality that is protective of wildlife, recreation, and other uses. 33 U.S.C. § 1251(a)(1), (2).

23.     To achieve Congress' goals, Section 303 of the CWA requires each state to establish and implement water quality standards ("WQS"), subject to review and approval by EPA. 33 U.S.C. § 1313(a)–(c).

24. WQS consist of the "designated uses" of a state's waters and the water quality criteria necessary to protect such uses. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 130.2(d).

25. The CWA requires each state to identify and list the bodies of water within its boundaries that fail to attain WQS. 33 U.S.C. § 1313(d)(1)(A).

26. The resulting list of impaired waters is known as a "Section 303(d) list."

27. States must establish TMDLs for each body of water on their Section 303(d) lists at levels necessary to implement WQS. 33 U.S.C. § 1313(d)(1)(C).

28. TMDLs must be set for each pollutant that prevents, or is expected to prevent, a body of water from attaining WQS. 40 C.F.R. § 130.7(c)(1)(ii).

29. Section 303(d) requires that each TMDL be set at a level "necessary to implement the applicable water quality standards . . . ." 33 U.S.C. § 1313(d)(1)(C).

30. Under EPA's implementing regulations, a TMDL is "[t]he sum of the individual [wasteload allocations] for point sources and [load allocations] for nonpoint sources and natural background." 40 C.F.R. § 130.2(i).

31. TMDLs prepared by states must be submitted to EPA, triggering the agency's duty to "either approve or disapprove" the TMDL within thirty days. 33 U.S.C. § 1313(d)(2).

32. If EPA disapproves the state's submission, the agency must promulgate its own TMDL to implement the applicable WQS. Id.

## FACTS

33. On October 3, 2016, EPA approved Maryland's TMDL for PCBs in the Gunpowder and Bird rivers. Ex. B.

34. PCBs are manmade chemicals that persist in the environment and accumulate in plant and animal tissue.

35. PCBs can also accumulate in human tissue through the consumption of PCB-contaminated foods, including fish that live in PCB-contaminated bodies of water, such as the Gunpowder and Bird rivers.

36. Exposure to PCBs has been linked to cancer and other adverse effects on the immune, reproductive, nervous, and endocrine systems.

37. Some PCBs that are deposited into the water column bind to suspended sediment, which then settle on the riverbed.

38. PCB-contaminated bottom sediment subsequently discharges a significant quantity of PCBs back into the water column.

39. This process occurs via resuspension of PCB-laden sediment and diffusion of dissolved PCBs into the water column.

40. Maryland's WQS designate the tidal sections of the Gunpowder and Bird rivers for uses related to water contact recreation, fishing, protection of aquatic life and wildlife, and shellfish harvesting. Md. Code Regs. 26.08.02.08(J).

41. Between 2006 and 2008, Maryland's water quality monitoring program revealed that both rivers violate WQS due to high concentrations of PCBs in fish tissue.

42. Maryland added the Gunpowder River to the state's Section 303(d) list as an impaired waterbody, requiring a TMDL for PCBs, in 2006. Maryland added the Bird River to its Section 303(d) list as an impaired waterbody, requiring a TMDL for PCBs, in 2008.

43. In the Gunpowder and Bird rivers TMDL, MDE estimates that "the transport of PCBs to the river from bottom sediment via resuspension and diffusion is currently . . . the major source of PCBs" in both rivers. Ex. A, at 21.

44. MDE predicts a net PCB load of 2,457 grams per year from bottom sediment in the Gunpowder River. The second largest identified source, the C.P. Crane Generating Station, accounts for 155 grams per year. Id.

45. MDE predicts a net PCB load of 303 grams per year from bottom sediment in the Bird River. The second largest identified source, Gunpowder River influence, accounts for 49.2 grams per year. Id.

46. The Gunpowder and Bird Rivers TMDL estimates that compliance with PCB WQS in the Gunpowder River will take 49 years. Id. at 28.

47. The Gunpowder and Bird Rivers TMDL estimates that compliance with PCB WQS in the Bird River will take 93 years. Id.

48. MDE did not establish load allocations in the TMDL for PCBs from bottom sediment in the Gunpowder and Bird rivers. Id. at 19, 21.

49. MDE stated: "The transport of PCBs from bottom sediments to the water column through resuspension and diffusion can also be a major source of PCBs in estuarine systems. However, . . . this is not considered a source under the framework of this TMDL." Id. at 19

50. MDE further stated:

> Although the transport of PCBs to the river from bottom sediment via resuspension and diffusion is currently estimated to be the major source of PCBs, this load contribution is resultant from other point and nonpoint source inputs (both historic and current) and is not considered to be directly controllable source. Therefore, this load will not be assigned a baseload or allocation.

Id. at 21.

51. The Gunpowder and Bird rivers TMDL assigns load allocations and load reductions for other non-point sources, including atmospheric deposition of PCBs. Id. at 35.

52. To achieve WQS compliance for the Bird River, the TMDL requires a 70% reduction in atmospheric deposition of PCBs and a 70% reduction of PCBs in non-regulated watershed runoff into the Bird River. Id.

53. MDE did not evaluate whether greater reductions in PCB discharges would have led to faster compliance with WQS in the Bird River. Id. at 28

54. Although atmospheric deposition and non-regulated runoff were assigned load allocations for the Gunpowder River, no reductions were assigned for those non-point sources. Id. at 35.

55. MDE explained that eliminating all point and non-point sources of PCBs to the Gunpowder River would reduce the time to WQS compliance from 49 years to 44 years. Id. at 28.

56. MDE stated that achieving WQS compliance in the Gunpowder River five years sooner "is not critical." Id.

57. MDE did not require load reductions for any point or non-point source of PCBs for the Gunpowder River. Id. at 35.

58. Prior to submitting the TMDL to EPA, MDE sought and obtained public comments on the proposed TMDL. Ex. E.

59. On September 18, 2015, GRK provided comments to MDE on the proposed TMDL. Ex. F.

60. In its comments to MDE, GRK objected to the proposed TMDL on the grounds that, among other things: 1) "[t]he methodology and science presented in the draft shows only a preference of the Department to promulgate a draft TMDL without sufficient evidence that . . . all potential sources of PCB's are included in the TMDL;" 2) that "a strong spatial relationship

appears between PCB concentrations in sediment and fish;" and 3) "the proposed draft does not properly safeguard aquatic uses of the waterbody or public health for those consuming fish from these waters within a reasonable timeframe." Id.

61. On October 30, 2015, MDE submitted the Gunpowder and Bird rivers TMDL to the Watershed Protection Division of the U.S. Environmental Protection Agency, Region III, for approval. Ex. B.

62. EPA approved the TMDL on October 3, 2016. Id.

63. EPA approved the Gunpowder and Bird rivers without an explanation for not assigning a load allocation to PCBs from bottom sediment. Id. at 9.

64. EPA stated instead that "[t]he water quality model developed for this TMDL simulates conditions within the water column and sediment as a single system. Therefore exchanges between the sediment and water column are considered internal loading and is not assigned a baseline load or allocation." Id.

65. EPA further stated that "the loads from resuspension and diffusion from bottom sediments are not considered to be directly controllable (reducible) loads . . . so they are not included in the tPCB load and TMDL allocation." Id. at 17.

66. EPA did not explain why some non-point sources are directly controllable and therefore subject to a load allocation, while resuspension and diffusion of PCB-laden bottom sediment is not. Id.

67. EPA did not explain its acceptance of MDE's decision that achieving WQS compliance five years sooner in the Gunpowder is not critical. Id. at 10.

68. EPA did not explain its acceptance of MDE's failure to evaluate the effects of greater reductions in PCB loading in the Bird River. Id.

## FIRST CLAIM FOR RELIEF
## CWA VIOLATION

69. Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 68 above.

70. EPA is required by 33 U.S.C. § 1313(d)(2) and 40 C.F.R. § 130.7(d)(2) to disapprove any TMDL submitted by a state that fails to meet the requirements of the CWA. This duty is mandatory.

71. EPA failed to perform such mandatory duty when it approved the TMDL for the Gunpowder and Bird rivers.

72. Under 40 C.F.R. 130.2(i), a TMDL must establish load allocations for all nonpoint and natural background sources of the covered pollutant.

73. The TMDL for the Gunpowder and Bird rivers failed to allocate loads for all nonpoint sources of PCBs in those rivers.

74. Specifically, the TMDL failed to set load allocations for PCBs discharged from bottom sediment in the Gunpowder and Bird rivers.

75. In the TMDL, MDE identified bottom sediment as <u>the</u> major source of PCBs in both the Gunpowder River and the Bird River.

76. The Gunpowder and Bird rivers TMDL violates the CWA because it failed to establish load allocations for PCBs from bottom sediment.

77. EPA's approval of the TMDL constitutes a failure to perform the agency's duty to disapprove the Gunpowder and Bird rivers TMDL for violating the CWA.

## SECOND CLAIM FOR RELIEF
## APA VIOLATIONS

78.     Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 77 above.

79.     EPA's approval of the Gunpowder and Bird rivers TMDL constitutes an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C).

80.     The Gunpowder and Bird rivers TMDL fails to establish load allocations for all sources of PCBs in the impaired rivers, in violation of the CWA and implementing regulations.

81.     Although the Gunpowder and Bird rivers TMDL establishes load allocations for less significant sources of PCBs, it fails to allocate loads to the most significant source of PCBs in both rivers: resuspension and diffusion from bottom sediment.

82.     EPA's approval of the Gunpowder and Bird rivers TMDL is arbitrary and capricious for failing to allocate loads to all sources of PCBs in the Gunpowder and Bird rivers in violation of the CWA. 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.2(i).

83.     The Gunpowder and Bird rivers TMDL also fails to take into account the load allocation for bottom sediment pollution in calculating final waste load allocations and load allocations.

84.     Without assigning load allocations for bottom sediment pollution, the Gunpowder and Bird rivers TMDL incorporates waste load allocations and load allocations that were calculated without consideration of pollution from the most significant source of PCBs in both rivers.

85. EPA's approval of the Gunpowder and Bird rivers TMDL is, therefore, arbitrary and capricious for failing to adequately account for the largest source of PCB pollution in both rivers.

86. Additionally, EPA's approval of the Gunpowder and Bird rivers TMDL is arbitrary and capricious because the agency failed to offer a reasoned explanation that responds to comments, considers relevant factors, and provides a rational connection between the facts found and the choices made.

87. EPA provided no explanation for its acceptance of MDE's claim that "[a]lthough the transport of PCBs to the river from bottom sediment via resuspension and diffusion is currently estimated to be the major source of PCBs, . . . this load will not be assigned a baseline load or allocation."

88. EPA provided no explanation for its conclusion to accept the Gunpowder and Bird rivers TMDL without assessing the impact of a load allocation for sediment pollution on waste load allocations and load allocations.

89. EPA provided no explanation for its assessment that PCB-laden bottom sediment is not reducible and therefore not subject to the assignment of a load allocation, while atmospheric deposition and non-regulated watershed runoff of PCBs are assigned load allocations.

90. EPA provided no explanation for accepting MDE's decision to forego compliance with WQS five years sooner in the Gunpowder River.

91. EPA provided no explanation for accepting MDE's non-point source load reductions in the Bird River without evaluating whether additional reductions would reduce time to compliance with WQS.

92. EPA provided no justification for accepting the TMDL's lengthy compliance timelines as reasonable.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A. Declare that Defendants have failed to perform nondiscretionary duties in violation of the Clean Water Act, including their failure to disapprove the Gunpowder and Bird rivers TMDL;

B. Declare that Defendants' approval of the Gunpowder and Bird rivers TMDL was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

C. Vacate Defendants' approval of the TMDL;

D. Remand the Gunpowder and Bird rivers TMDL to EPA for reconsideration in light of the Court's decision;

E. Direct EPA to abide by its mandatory duties under the CWA, including to disapprove the Gunpowder and Bird river TMDL for failing to include all required load allocations;

F. Award Plaintiff the reasonable costs of litigation, including attorneys' fees and costs; and

G. Grant such other relief as the Court deems appropriate.

Dated: July 29, 2020                                   Respectfully submitted,

/s/ Hope M. Babcock
Hope M. Babcock (D.C. Bar No. 14639)
Benjamin M. Barczewski
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Ave. N.W.

Washington, D.C. 20001
(202) 662-9535
babcock@law.georgetown.edu

*Counsel for Gunpowder Riverkeeper*